**UNITED STATES, Appellee,**

v.

**Abe SHELLY, III, Private First Class,
U.S. Army, Appellant.**

No. 46,405.
SPCM 16807.

U.S. Court of Military Appeals.

April 8, 1985.

For Appellant: *Colonel William G. Eck-hardt* (argued); *Lieutenant Colonel Paul J. Luedtke, Captain L. Sue Hayn* (on brief); *Colonel R. Rex Brookshire, II, Major Stephen R. Dooley, Captain Warren G. Foote, Captain Paul J. Moriarty.*

For Appellee: *Captain Samuel J. Rob* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Thomas M. Curtis* (on brief); *Lieutenant Colonel John T. Edwards, Captain Glenn D. Gillett, Captain David A. Brown.*

*Opinion*

EVERETT, Chief Judge.

A special court-martial composed of officers at Fort Bragg, North Carolina, convicted appellant of various offenses and sentenced him to a bad-conduct discharge, confinement at hard labor and partial forfeitures for 6 months, and reduction to the lowest enlisted grade. The specification with which this Court is now concerned

alleged that, on February 12, 1981, Shelly wrongfully appropriated a quarter-ton truck which was the property of the United States. The issue is whether the evidence supported the Government's theory that Shelly was criminally liable as an aider and abettor because he was the senior occupant of the vehicle and yet failed to prevent its misappropriation by the driver. 18 M.J. 423 (1984). Our review of the record satisfies us that the Government failed as a matter of law to carry its evidentiary burden.

## I

Military Police Investigator Patrick J. Courrier testified that on February 12, 1981, he investigated the overturning of a jeep "behind Pike Field on a tank trail" at Fort Bragg, and he had learned "that PFC Brown and PFC Shelly were in the vehicle when it overturned." According to two sworn statements which appellant gave about the incident, he "was in the barracks sitting on my bunk when BROWN came in and said to me that he was getting ready to go to chow and did I want to go." Appellant then accompanied Brown to the company messhall; but, because the line there was too long, they "went and got into the jeep and went down to" another mess hall, where they ate lunch. Thereafter, they drove around some before "the jeep just started to slid [sic] and flipped over." Shelly was "stuck under the jeep"; but Brown managed to extricate him. Thereupon, they sought help in getting the jeep upright.

Lieutenant Richard J. Geiger, a member of the same battery as appellant and Brown, testified that on February 12, a vehicle and driver were assigned to him. The driver, Private Brown, had driven Geiger to Alpha Company "in the morning and back at approximately noon. I then instructed him to park the vehicle next to the Bravo Battery supply room. I told him to secure it and meet me back there at 1300 hours." At about 12:45, Brown appeared alone at the battery and informed Geiger "that the vehicle had been stolen, by whom he did not know."

On direct examination, Geiger testified that at this time Brown had been a "Private E-2," while Shelly "was a Private First Class" and so was "the ranking individual." Asked to explain the term "vehicle commander," Geiger responded:

Sir, the vehicle commander is the highest ranking person in the vehicle, and the highest ranking person in the vehicle is responsible for the safety and safe operation of that vehicle and for the direction and the route by which that vehicle travels .... [N]o matter when an individual gets into a vehicle in our battery, if he is the ranking person, no matter where that vehicle is going, or if he's just a passenger, he is the vehicle commander.

On cross-examination, the Lieutenant conceded that he did not know whether on February 12th, Brown "was in fact a PFC who was under a suspended reduction to PV2." Geiger recalled that Brown had been reduced to Private E-2 under Article 15, 10 U.S.C. § 815; but he did not remember whether that punishment had been suspended.

Called as a government witness, Private Randall Brown testified that, on February 12, 1981, he had been in the battery area and was the driver of a quarter-ton truck, of which Lieutenant Geiger was in charge. Shelly, who at one time had been his roommate for a couple of months, had joined him to eat lunch. "We went to our messhall, but I had to be back at the riot control class at 1 o'clock and the line was too long, so we went down to the Repl [sic] and ate." Asked whether he had been authorized to make this trip, he replied that "they never authorize. They leave everything to the driver." In returning, he had gone "the long way around just to pass time"; but an accident occurred in which Shelly had been trapped underneath the vehicle. After extricating him, Brown finally found two other people who helped him upright the truck. According to Brown, he had been "a PFC" on February 12th, although he was not sure of his date of rank; and

Shelly held the same grade. Brown insisted that it had been his idea "to take the quarter-ton that day to use it to go to the messhall"; and Shelly did not ask him to use the vehicle in this way. So as far as Brown was concerned, the vehicle had been signed out to him and he was responsible for it. After they left the messhall where they ate, Shelly "didn't really know where I was going."

Captain David Thomas, appellant's battery commander, testified that PFC Shelly had been "the ranking individual" on February 12, 1981, because

[i]n late January '81, I had administered a company grade Article 15 to then PFC Brown. I reduced him to PV2, suspended the reduction and then in the beginning of February, he had broken my restriction and I vacated that suspended bust and did bust him to PV2.

Asked to explain the term "vehicle commander" to the court, Captain Thomas responded:

Basically the way I look at the vehicle commander is the senior man on the vehicle and it's his responsibility, whether he wants it or not, to insure the safe operation of that vehicle.

According to the captain, Shelly had been the vehicle commander on this occasion. Captain Thomas also testified on direct examination—surprisingly without defense objection—that Brown had told him "that PFC Shelly had asked him to go in a ride in the vehicle. I believe they had gone to lunch or something. At any rate, the first use of the vehicle was not even authorized, and then he told me that he had asked him to go for a ride during the lunch break."

Asked on cross-examination whether he had "ever personally informed Private First Class Shelly of your policy that any PFC operating a vehicle with a PV2 would be the vehicle commander," Captain Thomas replied that "I did not specifically point it out to him. I did address the battery formation reference the senior man in the vehicles." He had not "personally informed" appellant of this before February 12th.

After the parties rested and counsel presented final arguments, the judge instructed the court members as to the law of principals. He advised them:

Mere presence at the scene of the crime is not enough nor is mere failure to prevent the commission of an offense. If the accused witnessed the commission of the crime and had a duty to interfere but did not interfere because he wanted to protect or encourage Brown to take the vehicle, then he would be a principal, the accused would be. Now, there has been evidence that the accused suggested or evidence tending to show, that is, that the accused suggested or was aware of Brown's purpose in originally taking the vehicle, that he got into the vehicle and by doing so the prosecution urges you, under all of the circumstances, that amounted to encouragement for Brown to take the vehicle and that is one prong of the prosecution's theory of guilt by aiding and abetting in the wrongful appropriation of the jeep which has been alleged. *The other prong in the theory is that the accused was the senior occupant of the vehicle, that the battery commander had established a responsibility on the part of every senior occupant of a vehicle to control it and properly use it, that the accused was aware of that responsibility and declined to exercise his authority to prevent the taking of the vehicle by Brown and, therefore he had a duty to interfere but did not interfere because he wanted to protect or encourage Brown in taking the vehicle.* Now, either of those theories if proven beyond a reasonable doubt by the evidence would be sufficient to establish that the accused was guilty of wrongful appropriation as a principal.

(Emphasis added.)

## II

■ Essential to the success of any military organization is obedience. A subordinate must obey the commands of his superior, *see, e.g.,* Articles 90(2) and 91(2), Uniform Code of Military Justice, 10 U.S.C.

§§ 890(2) and 891(2), respectively; and the penalty for disobedience may be severe, *see* Table of Maximum Punishments, para. 127 *c*, Manual for Courts-Martial, United States, 1969 (Revised edition). However, commanders also have responsibilities, and they can be punished for failure to perform those responsibilities. Illustrative of this is a famous case in which an American military tribunal sentenced Japanese General Yamashita to death under the law of war because of his failure to perform his command responsibility to control the conduct of his troops. *See Application of Yamashita*, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946); A. Reel, *The Strange Case of General Yamashita* (1949) *(rep. in* 1971). Under the Uniform Code, a commander's failure to exercise his command responsibility may be punished as dereliction in the performance of his duties. *See* Article 92(3), UCMJ, 10 U.S.C. § 892(3).

However, appellant was not prosecuted for dereliction of his duties as "vehicle commander" of the jeep which overturned. Instead, the Government contended that Shelly was criminally responsible as a principal under Article 77 of the Uniform Code, 10 U.S.C. § 877, because he had failed to perform his duty to prevent Brown's wrongful appropriation of the vehicle. This contention—on which the military judge instructed the court members—is predicated on the Manual's observation that

> [w]hile merely witnessing a crime without intervention does not make a person a party to its commission, if he had a duty to interfere and his noninterference was designed by him to operate and did operate as an encouragement to or protection of the perpetrator, he is a principal.

Para. 156, Manual, *supra*. The same theory of criminal liability would allow prosecution of a guard for burglary if he failed to interfere with burglars entering a building he was assigned to protect and if his nonfeasance was intended to encourage or protect the burglars and, in fact, did encourage or protect them.

■ Whether a servicemember is tried under Article 92 for dereliction of duty or under some other Article on the premise that his failure to perform a duty has made him liable as a principal, the existence of the duty must be demonstrated by the evidence. Generally, this is not too difficult. For example, when a guard is posted, his duties usually are clearly assigned to him; and, to the extent they are not, common sense and military custom help fill in the gaps. Similarly, the duties of the commander of a military unit usually are well defined by regulation or by custom.

On the other hand, the duty of a "vehicle commander"—the duty on which the Government relied to establish Shelly's criminal liability—is not demonstrated in the record. Neither at trial nor on appeal has the Government cited any Army Regulation or generally applicable military directive which creates the status of "vehicle commander" and attaches specific duties to that status. Moreover, in the past this Court has not viewed the senior passenger in a vehicle as automatically having a responsibility to control its operation. *Cf. United States v. Waluski*, 6 U.S.C.M.A. 724, 21 C.M.R. 46 (1956).

■ The Government sought to establish that a directive from Captain Thomas to the members of appellant's battery made the senior passenger in a vehicle responsible for its operation. We do not question that a directive could be issued which would have this effect. However, duties imposed by a unit directive are only enforceable against unit members who have "actual knowledge" thereof. *Cf.* para. 171 *b*, Manual, *supra*; *Lambert v. California*, 355 U.S. 225, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957).

■ In this regard the government evidence is deficient. Captain Thomas merely testified that he "address[ed] the battery formation reference the senior man in the vehicles." The precise content of his remarks to the formation was never described to the court members by Thomas. Thus, we do not know whether he made clear in his remarks that his directive ap-

plied not only to senior passengers who were officers or noncommissioned officers—persons whose authority receives express recognition in the Uniform Code, *cf.* Articles 90–91—but also to all other passengers regardless of grade. Indeed, because the Government offered no evidence on this point, we do not know even that Shelly was present at the battery formation where Captain Thomas explained his directive; and Captain Thomas never testified that he had reduced his directive to writing or posted it on the unit bulletin board. Thus, whatever the duty which he sought to impose, the evidence does not prove that Shelly knew about it.

The evidence—all of which was presented by the Government—is only minimally sufficient to establish that appellant was then senior occupant in the vehicle: Captain Thomas testified to this effect. However, the evidence is not legally sufficient to establish that appellant *knew* that he was the senior occupant in the vehicle. Brown claimed that he had been a private first class on February 12th; and several other witnesses as well apparently believed that he had been in that grade on that date. Apparently the confusion about Brown's grade occurred because a reduction in grade ordered under Article 15 by his commander, Captain Thomas, had been suspended, but later the suspension had been vacated.

Even if this reduction already had taken effect before February 12th, Brown obviously believed on that date that he was a private first class. In light of Brown's own belief, we can only assume that Shelly also was under the impression that Brown was a private first class at that time. Certainly there is no evidence that, because of insignia that Brown was wearing or because the reduction in grade had been published on the unit bulletin board, appellant and the other battery members would have known of the reduction. In fact, as already indicated, all the evidence concerning what unit

members other than Captain Thomas knew of Brown's grade was to the effect that Brown was a private first class at the time of the accident. Therefore, Shelly would not have known that he was the senior occupant of the jeep—if, in fact, he was.

Since appellant lacked notice that he had either the right or the duty to control the operation of the vehicle in which he was riding with Brown, his failure to exercise such control provides no basis for inferring that he was seeking to encourage or protect Brown. By the same token, Brown—who apparently believed himself still to be a private first class on February 12th—would have been unaware that he was subject to the control of Shelly. Since neither Brown nor Shelly was aware that appellant had any right or duty to control Brown, Shelly's failure to exercise that control could hardly be characterized as "designed" to encourage or protect Brown's misappropriation of the jeep.* Also, the failure to exercise control under these circumstances could not be viewed as actually providing "encouragement" or "protection."

### III

Because the evidence is legally insufficient to sustain appellant's conviction for wrongful appropriation of the jeep, the conviction of that offense must be set aside. Accordingly, the decision of the United States Army Court of Military Review is reversed as to Additional Charge I and its specification, and the sentence. The findings of guilty thereon are set aside, and that Additional Charge and its specification are dismissed. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Military Review for reassessment of the sentence based on the approved findings of guilty.

Judge FLETCHER did not participate.

* Some question could also be raised as to whether Shelly was on notice of any limitations on Brown's authority to use the truck to drive to another messhall where they could eat more rapidly.

COX, Judge (concurring in part and in the result).

My initial concern with this case is that, as the United States Army Court of Military Review observed, "the military judge ... arbitrarily rejected appellant's pleas of guilty without adequate inquiry into their providence." *United States v. Shelly*, unpublished opinion at 1 (March 17, 1983). This had the effect of depriving appellant of his inalienable right to admit his guilt and if otherwise permitted by Article 45, Uniform Code of Military Justice, 10 U.S.C. § 845, to plead guilty, and to receive the benefit of his plea bargain. More importantly, it deprived appellant of a very good trial tactic, since entering pleas of "Guilty" to two specifications and "Not Guilty" to the others would have lent a certain credence to his defense. One can only speculate as to the spill-over effect appellant may have encountered in being forced to present specious defenses to charges he was willing to concede. However, the Court of Military Review's remedy of disapproving all punishment except the punitive discharge actually placed appellant in a better position than he would have been in under his original agreement and seems an adequate remedy.

With respect to the wrongful appropriation, the prosecution proceeded on two separate theories of liability. First, they argued that appellant was a principal to the offense, in that he shared Brown's criminal intent and encouraged Brown to take the vehicle. *See* para. 156, Manual for Courts-Martial, United States, 1969 (Revised edition). There was considerable evidence, both direct and circumstantial, which supported this theory. If this evidence were believed, appellant and the driver were on a joint venture, and both would be jointly and severally liable as principals for the wrongful appropriation.

The second and more difficult theory was that appellant, as senior occupant in the vehicle (or "vehicle commander"), "had a duty to" prevent or "interfere" with Brown's commission of the offense. Therefore, appellant's deliberate "noninterference" amounted to encouragement of the wrongful act, making him a principal. Para. 156, Manual, *supra*. I agree with Chief Judge Everett's opinion that there is insufficient evidence to establish this theory.

Although there was sufficient evidence for the prosecution to prevail on the first theory, I am left to speculate as to which theory the court members utilized to decide the case. Therefore, I am forced to conclude that the totality of circumstances deprived appellant of a fair trial on this charge. Ordinarily I would permit a rehearing where there is a valid theory to support the finding of guilty. But since I am convinced that a punitive discharge is justified by the other charges and that no useful purpose would be served by a rehearing, I join the Chief Judge in dismissing the charge. Although I question the need for reassessment of the sentence, I join in the disposition directed by the Chief Judge in order to effect settlement of this case. Accordingly, I concur in the result.