UNITED STATES

v.

**Major Robert K. MANN, United States Air Force.**

ACM 32558.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 7 Aug. 1996.

Decided 22 April 1999.

Appellate Counsel for Appellant: Frank J. Spinner (argued), Colonel Douglas H. Kohrt, Lieutenant Colonel Kim L. Sheffield, Captain Karen L. Hecker, Captain W. Craig Mullen, and Captain Stephen P. Kelly.

Appellate Counsel for the United States: Captain Steven D. Dubriske (argued), Colonel Brenda J. Hollis, Colonel Anthony P. Dattilo, and Colonel Michael J. Breslin.

Before YOUNG, Senior Judge, SPISAK and SCHLEGEL, Appellate Military Judges.

OPINION OF THE COURT

SCHLEGEL, Judge:

The appellant was tried by a general court-martial composed of members at Shaw Air Force Base (AFB), South Carolina. Contrary to his pleas, he was found guilty of failing to obey a lawful order of a superior, willful dereliction of duty, presenting a false claim, and fraternization in violation of Articles 90, 92, 132, and 134, UCMJ, 10 U.S.C. §§ 890, 892, 932, and 934. He was sentenced to a dismissal. On appeal, he asserts nine errors for our consideration. Finding no merit in his arguments, we affirm the findings and sentence.

## I. Factual and Legal Sufficiency

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). We are to "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. McGinty*, 38 M.J. 131, 132 (C.M.A.1993) (quoting *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991)). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we ourselves are convinced of the accused's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325.

### a. Fraternization

The specification alleged the appellant fraternized with Master Sergeant (MSgt) SDP by engaging in sexual intercourse, receiving back rubs, dining alone with her, traveling alone with her, spending off-duty time with her, exercising together, and frequently speaking on the phone. The members in finding the appellant guilty excepted the language involving sexual intercourse and back rubs. As a result of the excepted language, the appellant argues his conviction for fraternizing with MSgt SDP is factually and legally insufficient because there is "no clear line between what conduct is or is not considered professional and appropriate with respect to officers and enlisted personnel who are required to work as a team or in a mentoring relationship." In effect, the appellant argues he never treated MSgt SDP on terms of military equality because his interaction with her was purely duty related.

The elements of fraternization are: (1) That the accused was a commissioned or warrant officer; (2) That the accused fraternized on terms of military equality with one or more certain enlisted member(s) in a certain manner; (3) That the accused then knew the person to be an enlisted member; (4) That such fraternization violated the custom of the accused's service that officers shall not fraternize with enlisted members on terms of military equality; and (5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. *Manual for Courts–Martial, United States* (*MCM* ), Part IV, ¶ 83b (1995 ed.).

The evidence demonstrates that the appellant and his wife, an active duty Air Force major, were jointly assigned to Shaw AFB. He arrived in March 1993 as Chief of Information Management and became the Director of Quality Improvement for the 20th Fighter Wing in June 1994. MSgt SDP and her husband Senior Master Sergeant (SMSgt) SRP reported to Shaw AFB in September 1993. She was assigned as the commandant of the newly created Customer Service University (CSU), where she was responsible for the development of this initiative aimed at improving customer service at Shaw AFB. Occasionally, during the development of CSU, MSgt SDP would seek advice from the appellant. Under MSgt SDP's stewardship, CSU became a successful program. In August 1994, MSgt SDP was reassigned as the superintendent of the 9th Air Force command section. When the CSU concept was selected for presentation to the October 1994 Air Force Quality Symposium at Maxwell AFB, MSgt SDP and the appellant were chosen to provide the briefing.

SMSgt SRP believed that prior to arriving at Shaw AFB, his marriage to MSgt SDP was a good personal and professional match. However, after the symposium, MSgt SDP told him she was disillusioned and unhappy. SMSgt SRP tried to salvage the marriage but it began to deteriorate after Christmas 1994. In June 1995, SMSgt SRP and MSgt SDP were notified of a joint assignment to Kadena Air Base (AB). Shortly after receiving the notice, MSgt SDP went to Langley AFB for temporary duty (TDY). When she returned, MSgt SDP rejected the assignment. At the time, SMSgt SRP was under the assumption his wife drove to Langley AFB with people from her office. Later, he discovered she actually went with the appellant. SMSgt SRP also noticed that around this same time, his wife stopped wearing her wedding rings.

In August 1995, SMSgt SRP opened a telephone bill and found a 50–minute phone call from Hatsboro, Pennsylvania, to a Shaw AFB telephone number on Saturday, 22 July 1995, at 1930 hours. He knew his wife was TDY in Pennsylvania when this call was made. When SMSgt SRP called the Shaw AFB number, the appellant answered. A few days later, SMSgt SRP called the appellant's wife to talk with her about his suspicions that his wife and the appellant were having an affair. According to him, the appellant's wife knew right away what he was calling about. Later, they met at a local restaurant to continue the discussion about their spouses. Eventually, SMSgt SRP told his commander about his suspicions.

Staff Sergeant (SSgt) Michael B. Peterson worked for the appellant in the information management division. When the appellant became the director of the quality office, SSgt Peterson was reassigned to the quality office. SSgt Peterson observed that MSgt SDP regularly visited the quality office. SSgt Peterson remembered on one occasion the appellant called MSgt SDP and invited her to the office to drink beer after work. SSgt Peterson noticed that one day during April 1995 the appellant was depressed at work the entire day. After work, the appellant told SSgt Peterson he was having an affair. SSgt Peterson assumed "an affair" included a sexual relationship. He believed the appellant was involved with MSgt SDP because of things the appellant said about MSgt SDP and because he knew they exercised and ate together. As a result, SSgt Peterson was not surprised when the appellant said he was involved with MSgt SDP. According to SSgt Peterson, the appellant said "well, its just not the sex, she's fun to be

around, she's energetic, full of energy." Later in the month, the appellant told SSgt Peterson it was over with MSgt SDP. However, the appellant also talked about moving into the same apartment complex with her and told him not to tell anyone. In June 1995, when MSgt SDP came to the quality office, SSgt Peterson noticed she was upset and she told him that she had received an assignment. She and the appellant went into the adjacent classroom and shut the door. The appellant later commented to SSgt Peterson that MSgt SDP's joint assignment had been canceled. The appellant told SSgt Peterson he was trying to get an assignment to HQ Air Combat Command (ACC) and if everything worked out well, MSgt SDP would also be reassigned to ACC and they could get married. When the commander's investigation into the appellant's relationship with MSgt SDP began, the appellant coached SSgt Peterson to tell everyone his relationship with her was platonic.

Lynn Anderson, a former Air Force officer who worked for the appellant in the quality office, was scheduled to attend the quality symposium at Maxwell AFB in October 1994. When she spoke with the appellant about people from the office riding to the event together, he said he was riding with MSgt SDP and there was no room for anyone else. Before the symposium, she believed the appellant and MSgt SDP had a professional relationship. However, her belief changed after the symposium when the appellant and MSgt SDP started spending more time together and he began expressing frustration with his marriage. Ms. Anderson observed that MSgt SDP's visits to the quality office varied but they increased in frequency beginning in August 1994. She also was aware that the appellant would sometimes invite MSgt SDP over to the quality office at the end of the duty day. Ms. Anderson noticed that when the appellant and MSgt SDP talked on the telephone, he would lower his voice, like he did when he was talking with his wife. This made Ms. Anderson feel uncomfortable and resulted in her often leaving the office so the appellant could have some privacy while talking with MSgt SDP. She also observed the appellant and MSgt SDP frequently went to lunch and exercised together.

MSgt SDP testified for the prosecution under a grant of testimonial immunity. She believed her marriage was good when she and her husband arrived at Shaw AFB but they grew apart. She was not excited about the assignment to Kadena AB because it would require her to start at the bottom again and because she had been selected for a job with the 9th AF Inspector General's (IG) team. After her husband refused to turn down the assignment, she called a lawyer about separating from him. MSgt SDP could not recall how many times a week she ran with the appellant because their schedules varied. She admitted to dining alone with him when they were TDY and having lunch with him on base. She testified she never fraternized, kissed, gave back rubs, or had intercourse with the appellant.

MSgt SDP acknowledged she and the appellant stayed at the same Holiday Inn at the symposium in October 1994. She explained they drove to the symposium alone in her station wagon because there was no room for other people. On the first night of the symposium, she said they ate alone at a restaurant across from the hotel. On another evening, they ate at a seafood restaurant alone. She testified she continued to talk with the appellant and visit the quality office after the symposium because she was interested in quality as an AF member. She denied the appellant ever specifically invited her to the quality office.

MSgt SDP testified she participated in a Blue Flag exercise at Hurlburt Field, Florida, in January or February 1995. She said the participants from Shaw AFB were all billeted at a Ramada Inn, but because of an error her name was left off the registration list. She was then sent to another hotel, the Carousel, about 10 miles away from the exercise location. Initially, she said she thought the hotel was a "flea bag" and hated her room because the bar was above it. However, later she liked the accommodations because the room had a kitchen and ocean view. She denied being aware that at the same time the appellant was also staying in the

hotel even though she was in room 20 and the appellant was in room 28.

In June 1995, MSgt SDP was scheduled to travel to Langley AFB with two coworkers on a TDY. They obtained a government car and planned to travel together. However, during a conversation with the appellant, she learned he was also going to Langley AFB and decided to go with him because he was traveling alone. During the drive, they talked about quality and her marriage. On two of the three days she was TDY at Langley AFB, the appellant picked her up in the morning. They also ate lunch together twice, once with a group and once alone. When her TDY was over, MSgt SDP elected to stay an extra night rather than go home with her coworkers because she did not like to travel at night. She and the appellant decided to attend the change of command ceremony for the ACC commander the next day. By staying at Langley AFB an extra day, she missed her unit picnic at Shaw AFB. On the morning of the change of command, she did not feel like attending, so she and the appellant drove back to Shaw AFB, stopping on the way to shop. MSgt SDP never told her husband she went with the appellant to Langley AFB.

The appellant testified his marriage was full of ups and downs and he almost filed for divorce in May 1993. He said that he started running seriously in 1991 but he never ran alone with MSgt SDP. He denied knowing until weeks later that MSgt SDP was at a Blue Flag Exercise in Florida and staying in the same hotel he was staying in during his TDY and leave. He denied making plans to go TDY to Langley AFB after finding out MSgt SDP was going there with the IG team. The appellant said he decided to stay for the change of command because General (Gen) Loh had been one of his mentors but he had to check out of the hotel that he was staying in because his reservation expired. When asked where he stayed that night, the appellant said he slept in his jeep after touring civil war battle sites and looking at real estate in the middle of the night. He characterized his relationship with MSgt SDP as thoroughly professional and triumphantly successful. He denied having a sexual rela-

tionship with MSgt SDP or receiving back rubs from her.

The prosecution submitted into evidence the appellant's and MSgt SDP's telephone records for December 1995 through April 1996. The records showed that during this period they called each other over 140 times. This included calls while MSgt SDP was TDY to Charlotte, North Carolina, Louisville, Kentucky, and Savannah, Georgia. Also included were calls made by the appellant using MSgt SDP's long distance calling card. The appellant also called the homes of MSgt SDP's sisters and parents. MSgt SDP said she told the appellant he could call her family if he needed their support, and to reassure her family that she was okay. MSgt SDP also testified she gave the appellant her telephone calling card number in June 1995 because he didn't have one. MSgt SDP said the appellant was "inquisitive about calling cards" and "had never used one." MSgt SDP maintained that whenever she and the appellant talked, it was for "support, encouragement, and faith through Christianity." The appellant echoed her explanation about the purpose of the frequent telephone calls but was forced to admit he never called MSgt SDP while his wife was present.

It is axiomatic that a professional relationship between officer and enlisted personnel on matters pertaining to their duties can never be viewed as a violation of the prohibition against fraternization. In today's environment of shrinking budgets and reductions in manpower in the face of expanding commitments, the Air Force needs increased teamwork between its officer and enlisted forces. However, a professional relationship between an officer and enlisted member can become personal when they allow the focus of the relationship to change. In the Air Force, the responsibility to maintain the relationship on a professional level belongs to the officer. Air Force Instruction (AFI) 36–2909, *Professional and Unprofessional Relationships*, ¶¶ 5 and 6. This instruction was admitted as a prosecution exhibit. In addition, a number of witnesses testified that there was a custom in the Air Force that prohibited fraternization between officers and enlisted members.

*United States v. Wales,* 31 M.J. 301, 309 (C.M.A.1990).

■ The appellant argues that since the members excepted the language from the specification alleging sexual intercourse and back rubs, there is insufficient evidence he treated MSgt SDP on terms of military equality. However, the law is clear that a sexual relationship is not a prerequisite for conviction of fraternization. *United States v. McCreight,* 43 M.J. 483 (1996); *United States v. Nunes,* 39 M.J. 889 (A.F.C.M.R.1994). Indeed, the prohibition against fraternization predates the integration of women into the armed forces. *MCM,* A23–18. The military judge clearly instructed the members that

[n]ot all contact or association between officers and enlisted persons is an offense. Whether the contact or association in question is an offense depends on the surrounding circumstances. Factors that you should consider include whether the conduct has compromised the chain of command, resulted in the appearance of partiality, or otherwise undermined good order, discipline, authority, or morale. The facts and circumstances must be such as to lead a reasonable person experienced in the problems of military leadership to conclude that good order and discipline in the armed forces have been prejudiced by their tendency to compromise the respect of enlisted persons for the professionalism, integrity, and obligations of an officer.

■ Certainly, the testimony of SMSgt SRP provided all the evidence the government needed of adverse impact on good order, discipline, authority, and morale. In addition, his testimony was *prima facie* evidence of compromised respect for the appellant's professionalism and integrity. However, SMSgt SRP was not the only person who perceived an unprofessional relationship existed between the appellant and MSgt SDP.

The testimony of Ms. Anderson and SSgt Peterson leaves no doubt they believed the appellant and MSgt SDP were more than just travelers on an amorphous quality journey. Ms. Anderson knew the appellant often asked MSgt SDP to come to the office at the end of the day and heard him lower his voice when talking with MSgt SDP. As a result, she felt compelled to leave the office. SSgt Peterson's observations and the appellant's comments convinced him the appellant and MSgt SDP had a relationship that went beyond their duties. In addition, although both the appellant and MSgt SDP maintained they ran in a group with other people and only ate meals together when they discussed "quality," others perceived they engaged in these activities so they could be together.

The evidence also supports the member's determination that the appellant scheduled TDYs to coincide with some of MSgt SDP's TDYs. On one of these occasions, they traveled together and appellant's story concerning the purpose of the trip and his whereabouts on the last night of this trip is not credible. All these facts also provide a basis for the member's finding that the appellant had compromised his standing as an officer for the pursuit of his personal relationship with MSgt SDP.

Finally, their telephone records and the fact that the appellant talked with members of MSgt SDP's family also support the members' finding that during the charged time period their relationship was based on something much more personal than just being mutual quality enthusiasts.

The finding by the members that the appellant committed fraternization with MSgt SDP is legally sufficient. There was sufficient evidence before the members that the appellant's conduct with MSgt SDP negatively affected good order and discipline and compromised the appellant's authority as an officer. Finally, we are convinced of the appellant's guilt beyond a reasonable doubt.

### b. Presenting a False Claim

■ The appellant was found guilty of presenting a false claim for $129.50 based on a TDY to Langley AFB in 1995. The appellant argues the members' finding is factually and legally insufficient because he did not possess the intent to defraud because the TDY was in furtherance of his military duty. The prosecution contended the appellant was not entitled to payment because he concocted

the TDY to spend time with MSgt SDP, who was also TDY to Langley AFB.

The appellant said he went to Langley AFB to discuss the Government Performance and Results Act (GPRA) because of his personal concern the ACC Comptroller needed his help to prepare for testimony before Congress. He also said he met with other Air Force personnel about quality issues and used his time to educate himself on the GPRA. The appellant said Colonel (Col) Thomas B. Poole directed and authorized his TDY to Langley AFB. He also testified he decided to stay at Langley AFB to attend Gen Loh's change of command ceremony because the general had been a mentor to him. He realized his orders were about to expire, so he contacted his office and directed them to obtain Col Poole's approval for an extension. The appellant said his office informed him Col Poole was also at Langley AFB but he could not find the colonel.

Col Poole testified he met the appellant in January 1995 when he became the vice-wing commander at Shaw AFB. He served as the acting commander between April and July 1995. While the acting wing commander and appellant's supervisor, Col Poole said he did not authorize the appellant to go to Langley AFB in June 1995 to discuss the GPRA. He also said he would expect a person to return to Shaw AFB if they discovered after arriving at the TDY location they could not accomplish the purpose of the TDY. He testified, if an individual needed to extend a TDY, he would expect the individual to contact him. Col Poole said the appellant never contacted him for an extension.

The testimony of Captain (Capt) Heather Mock, coordinator of GPRA program at ACC, does not support the appellant's assertion he had official business about the GPRA at Langley AFB. She was under the impression he was coming to talk with the quality office at ACC about quality and a job. She did not believe her office was the primary reason for the appellant's TDY. Capt Mock testified the GPRA had little to do with preparing the ACC Comptroller to testify before the Congress. Although the appellant did talk with Capt Mock, she said he only stayed for 45 minutes and picked up a pack-

age of GPRA materials she normally faxed or emailed to the field. She also testified there were no GPRA meetings scheduled for the period of the appellant's TDY.

The evidence is legally and factually sufficient to support the members' finding that the appellant intended to defraud the government by presenting a travel voucher claim requesting reimbursement for a five-day TDY based upon a 45–minute conversation with Capt Mock.

### c. Dereliction of Duty

■ The appellant was found guilty of dereliction of duty by willfully failing to properly use official time and government funds in the generation and execution of a TDY to Langley AFB from 15 through 23 June 1995. He argues because he "had the freedom to determine what his duties were," there is no "legally discernible standard by which any dereliction could be measured." The appellant believes he possessed broad discretion to do anything he saw fit in the execution of his duties and, therefore, he was the sole judge of what his duties were and how to fulfill them.

The elements of willful dereliction of duty are: (1) that the accused had a certain duty; (2) that he knew of the duty; and (3) that he willfully failed to perform the duty. *MCM*, Part IV, ¶ 16b(3). The government must prove the existence of a duty. However, there are a variety of sources from which a duty may emanate, including treaty, statute, regulation, lawful order, standard operating procedure, or custom of the service. *MCM*, Part IV, ¶ 16c(3)(a). "When a servicemember is tried for dereliction of duty, 'the existence of the duty must be demonstrated by evidence.' Demonstrating a certain duty 'is not too difficult.'" *United States v. Tanksley*, 36 M.J. 428, 430 (C.M.A.1993) (quoting *United States v. Shelly*, 19 M.J. 325, 328 (C.M.A.1985)). The prosecution contended there must be a legitimate governmental purpose to justify the expenditure of both official time and funds, and the appellant knew he was violating this rule by remaining on the TDY to Langley AFB for personal reasons.

In addition to the testimony by Col Poole in b. above, he also said that when he became the vice-wing commander, he went to the appellant's office to introduce himself and offered his support for quality improvement throughout the wing. Shortly thereafter, the appellant requested to go TDY to three civilian sponsored quality symposiums. Col Poole denied the appellant's requests and told him that because there were so many good military quality programs, he would not authorize the appellant to go to any civilian quality programs in a TDY status. Later the appellant requested permission from Col Poole to attend a quality off-site involving the city of Sumter, South Carolina. Col Poole allowed him to attend this two-day function in a non-pay status. This shows that the appellant knew Col Poole was the approval official for all of his TDYs. Finally, Col Poole said the appellant never provided him with a report of his activity concerning the June 1995 TDY to Langley AFB.

The appellant said he talked to Capt Mock about coming to Langley AFB to discuss the GPRA. However, Capt Mock, an unbiased witness, believed the appellant was coming to Langley AFB to look for a job and attend Gen Loh's retirement ceremony. This testimony from Capt Mock corroborates SSgt Peterson's recollection that the appellant told him in April 1995 about the appellant's desire to seek an assignment to ACC so that he and MSgt SDP could be together. After Capt Mock's testimony, the appellant was forced to admit that his assistance was not required to prepare the ACC comptroller to testify to the Congress.

Finally, Prosecution Exhibit 7 indicates the purpose of the appellant's TDY to Langley AFB in June 1995 was "TO ATTEND GOVERNMENT PERFORMANCE AND RESULTS ACT (GPRA) MEETINGS WITH ACC GPRA TEAM."

The testimony of Col Poole and Capt Mock, and Prosecution Exhibit 7 are legally sufficient to support the court members' finding of guilty on this offense. Col Poole's testimony, and a modicum of common sense, demonstrates that when the appellant was done with his 45–minute conversation with Capt Mock, he should have returned to Shaw AFB. Further, after examining all the evidence of record, we are also convinced beyond a reasonable doubt of the appellant's guilt of this offense and reject his assertion that if he "[c]ould play golf four days a week and otherwise achieve the taskings given to him one day a week, then he would not be derelict in the performance of his duties."

## II. The No–Contact Order

On 21 December 1995, the appellant was issued an order to not contact MSgt SDP. The order did not restrict the appellant's counsel from contacting MSgt SDP. At trial, the military judge denied the appellant's motion to dismiss the charge and specification based upon unlawful command influence and a violation of the Sixth Amendment. Before us, the appellant attacks the sufficiency of the order, contends the order was otherwise unlawful, and renews his argument that the order amounted to unlawful command influence and violated his Sixth Amendment right to confront the witnesses against him.

### a. Legal Sufficiency of Failure to Obey the Order

The appellant argues we must set aside his conviction for violating the order not to contact MSgt SDP because Lieutenant Colonel (Lt Col), then Major, Ellis did not issue the order but was merely acting as a messenger for Col Rosa. The government counters the evidence is legally sufficient and, if a discrepancy exists, then it amounts to a non-fatal variance.

The specification reads, in pertinent part, "having received a lawful command from Lieutenant Colonel Ruth E. Ellis, his superior commissioned officer, then known by the said Major Mann to be his superior commissioned officer...."

The written order provides Col Rosa "has directed" and that the order remains in effect "until rescinded by" him. The signature block indicates Lt Col Ellis signed the letter "FOR THE COMMANDER" as "Commander." Lt Col Ellis testified, "I felt it was appropriate to give this sort of order."

Lt Col Ellis was the last witness for the prosecution during its case in chief. After the prosecution rested, the appellant unsuc-

cessfully moved to dismiss this specification. When that motion was denied, he moved for a finding of not guilty. However, neither motion was based on the argument raised in this appeal. The appellant, in closing argument on findings, did ask the members to acquit him of this offense because the prosecution failed to show Lt Col Ellis issued the order.

 The standard of review for legal sufficiency is cited in the first assignment of error. However, conflicts between the pleadings and proof raise the issue of variance rather than one of sufficiency of the evidence. *United States v. Miller*, 34 M.J. 598 (A.C.M.R.1992). The critical question involving variance is prejudice. In determining prejudice, we look to see if the appellant has been misled to the extent that he has been unable to prepare for trial and whether he is protected against another prosecution for the same offense. *United States v. Lee*, 1 M.J. 15, 16 (C.M.A.1975). "To prevail on a fatal-variance claim, appellant must show that the variance was material and that it substantially prejudiced him." *United States v. Hunt*, 37 M.J. 344, 347 (C.M.A.1993).

 In *United States v. Marsh*, 11 C.M.R. 48, 1953 WL 1971 (C.M.A.1953), the Court of Military Appeals reversed the conviction of Private Marsh for willful disobedience of an order of a superior officer. Private Marsh was scheduled to depart for an overseas assignment on 12 December 1951, from Fort Lawton, Washington. He surrendered to military authorities at Fort McPherson, Georgia, on 4 January 1952. On 11 January 1952, by special order, he was directed to proceed to Fort Lawton with costs for the transportation charged against him. Pursuant to a standing operating procedure on absentees promulgated by the commanding general of Third Army, the confinement officer, a Capt Sikes, read the accused a letter-order which was captioned "a direct order" which instructed Private Marsh to proceed to Fort Lawton immediately. Both the special order and the direct order were issued "by command" of the general officer. An adjutant signed the special order and Capt Sikes signed the letter-order. Private Marsh boarded a train the same day, but got off the next day, and returned to his home in Knoxville, Tennessee, where he was apprehended. The specification charged Private Marsh with the willful disobedience of Capt Sikes. The court, after analyzing Col Winthrop's treatise and the Army's rules and customs on orders, found that, because Capt Sikes did not have authority to issue an order involving travel allowances, he did not have the actual authority to issue the letter-order to Private Marsh; he was simply acting in his capacity as a staff officer for the commanding general. Therefore, Private Marsh violated the general's order, not Capt Sikes,' and this was a fatal variance. The court recognized that "[u]ndoubtedly, under a proper factual situation an intermediate may, by placing his authority behind the order, become the one whose order is violated. But to do this, the intermediate officer must have the authority to issue such an order in his own name and it must be issued as his, not as the representative of the superior." *Id.* at 51.

There was no dispute Lt Col Ellis had the authority to issue this order to the appellant. We believe under these circumstances there was no variance even though the written order leaves the reader with the impression that Col Rosa was the superior commander issuing the order and Lt Col Ellis was the intermediate commander providing the appellant with notice of the order.

Lt Col Ellis' testimony that giving the order was appropriate supports the members' finding that she used her authority as the mission support commander to issue the order. During the trial, the appellant testified Lt Col Ellis denied him access to a witness.

Nevertheless, even if we were to find a variance, it would not constitute a fatal variance as in *Marsh* because the appellant presented no evidence of prejudice. He was not misled to the extent that he was unable to prepare and he is protected against another prosecution for the same offense.

### b. Constitutionality of the Order

 Interference with an accused's access to witnesses is a form of unlawful

command influence, when done under the mantle of command authority. *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A.1986); *United States v. Washington*, 42 M.J. 547, 556 (A.F.Ct.Crim.App.1995). The burden of producing evidence of unlawful command influence is on the appellant. *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A.1994). The appellant must present more than a bare allegation or mere speculation. *United States v. Johnston*, 39 M.J. 242, 244 (C.M.A. 1994*).* "An appellant must (1) 'allege [ ] sufficient facts which, if true, constitute unlawful command influence;' (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the proximate cause of that unfairness.... The same three-pronged analysis would apply to an allegation of unlawful interference with access to witnesses." *Stombaugh*, 40 M.J. at 213 (quoting *United States v. Levite*, 25 M.J. 334, 341 (C.M.A.1987) (Cox, J., concurring)). Once an appellant satisfies his burden, the government must disprove the allegation. *Stombaugh*, 40 M.J. at 213–214. We must then be "persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *Thomas*, 22 M.J. at 394. If unlawful command influence has been addressed at trial, we will defer to the military judge's findings of fact, unless they are clearly erroneous. *See United States v. Wallace*, 39 M.J. 284, 286 (C.M.A.1994). However, whether "unlawful command influence" flows from those facts is a question of law, which we review *de novo. Id.*

■■■■ The Sixth Amendment guarantees servicemembers the right of compulsory process and confrontation. *Stombaugh*, 40 M.J. at 212. A commander's interference with access to witnesses by a military accused or his or her defense counsel threatens "the fundamental right to a fair trial [ ] and the Sixth Amendment right to compulsory process, and the right to confront and to cross-examine witnesses." *Id.* (citation omitted). "Not every constitutional violation, however, requires corrective action; and the findings and sentence of a court-martial can be affirmed if the reviewing court concludes beyond a reasonable doubt that the trial result was not affected by that violation."

*United States v. Gleason*, 43 M.J. 69, 73 (1995) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

■■■ The appellant did not meet his burden on interference with his access to witnesses under an unlawful command influence theory because he failed to demonstrate the proceedings were unfair. Similarly, his claim under the Sixth Amendment also fails because he has not shown any specific prejudice. *United States v. Medina*, 992 F.2d 573, 579 (6th Cir.1993).

### c. Lawfulness of the Order

■■■■ Our finding that the order did not amount to unlawful command influence or violate the appellant's Sixth Amendment right to confront the witnesses against him does not end our inquiry. We must still determine whether the order was lawful. " 'It is a ... long-standing principle of military law that' an order from a known superior is presumed to be lawful unless 'palpably illegal on its face.' " *United States v. Austin*, 27 M.J. 227, 231–32 (C.M.A.1988) (quoting *United States v. Trani*, 3 C.M.R. 27, 30–31, 1952 WL 1824 (C.M.A.1952)). Personal notions or beliefs as to the legality of the order are not relevant. *Austin*, 27 M.J. at 232. The presumption of the lawfulness of an order may be rebutted. *Unger v. Ziemniak*, 27 M.J. 349, 359 (C.M.A.1989). We review the military judge's findings of fact using a clearly erroneous standard and consider his application of the law to those facts *de novo. United States v. Hughey*, 46 M.J. 152, 154 (1997).

■■■ The order directed the appellant to "cease and refrain from any and all contact of any nature" with MSgt SDP. It informed the appellant that violating the order could result in punitive action under the UCMJ. It also indicated the appellant's counsel would have unrestricted access to MSgt SDP. The written order was given to the appellant after the charges against him had been preferred. The military judge found the order was directed to stop the appearance of impropriety between the appellant and MSgt SDP. He ruled the order was in furtherance of military needs. He found the

order was lawful and directed at the appellant, not witnesses. The military judge also noted counsel for the appellant could contact MSgt SDP. Finally, he found the appellant had not shown any prejudice or unfairness resulting from the order.

We agree with the military judge that the order served a legitimate military purpose, thus maintaining good order and discipline within the military community at Shaw AFB at both the wing and numbered Air Force levels. Because the appellant had been relieved from his position as director of quality improvement, there was no longer any legitimate basis for him to communicate with MSgt SDP except on a personal and, therefore, unprofessional level.

The appellant argues a less restrictive order directing him to cease all unprofessional contacts with MSgt SDP would have been lawful. However, because the appellant's argument at trial and on appeal is that all of his contacts with her were professional, the order he suggests would have been meaningless in theory and effect.

The record contains no evidence the appellant's attorneys were ever denied access to MSgt SDP or that the appellant ever requested permission to speak with her. The appellant's argument about his belief that he was authorized to talk with MSgt SDP by the Article 32 investigating officer is irrelevant because the investigation did not begin until 21 February 1996.

### III. Sentence Appropriateness

The appellant argues his sentence is too severe after consideration of his 17 years of service to the Air Force. The government contends the appellant's crimes justify the sentenced adjudged by the court members and approved by the convening authority.

In determining sentence severity, this Court must exercise its judicial powers to assure that justice is done and that the accused gets the punishment he deserves. Performing this function does not authorize this Court to exercise clemency. *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A. 1988). The primary manner by which we discharge this responsibility is to give individualized consideration to an appellant, in-

cluding the nature and seriousness of the offenses and the character of the appellant's service. *United States v. Snelling*, 14 M.J. 267 (C.M.A.1982). Applying this standard, we do not find appellant's sentence inappropriately severe. Article 66(c), UCMJ.

### IV. Disqualification of Assistant Trial Counsel

The appellant argues the military judge committed prejudicial error by failing to disqualify the assistant trial counsel, Capt D. The appellant contends Capt D served as an investigating officer in the case and was prohibited from serving as assistant trial counsel by virtue of Article 27, UCMJ, 10 U.S.C. § 827. The government's position is Capt D was not disqualified and the appellant suffered no prejudice as the result of his role before or during the trial.

After SMSgt SRP told his commander his suspicions about his wife and the appellant, an investigation, pursuant to AFI 90–301, *Inspector General Complaints*, was directed by the wing commander. Lt Col Herlong was appointed as the investigating officer. Capt D was selected to serve as his legal advisor for the investigation. The military judge considered the affidavits of Lt Col Herlong and Capt D, and the testimony of Lt Col Herlong in reaching his essential findings. The military judge determined Capt D "did not formulate or prepare a report nor did he assist ... with preparation of a report which contained the investigating officer's conclusions and recommendations regarding the matters under investigation." The military judge, in denying the motion at trial, held Capt D did not serve as an investigating officer and was not disqualified from serving as assistant trial counsel.

We will accept the military judge's findings of fact unless they are clearly erroneous. *United States v. Burris*, 21 M.J. 140 (C.M.A.1985). The standard of review on the military judge's decision concerning disqualification of counsel is abuse of discretion. *United States v. Hamilton*, 41 M.J. 22, 27 (C.M.A.1994). Defects in the qualification of trial counsel are tested for prejudice. *Wright v. United States*, 2 M.J. 9

(C.M.A.1976). *See also* Rule for Courts–Martial (R.C.M.) 901(d)(3). The military judge's findings are fully supported by the record and are accepted. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

■ The appellant relies on *United States v. Trakowski*, 10 M.J. 792 (A.F.C.M.R. 1981), a case decided under the *Manual for Court–Martial, United States,* 1969 (Revised ed.), in urging us to find the military judge committed prejudicial error. In *Trakowski,* we held a judge advocate conducting a pretrial confinement hearing was an investigating officer and disqualified from serving as trial counsel. The basis for our ruling was paragraph 64 of the 1969 *Manual* that included within the definition of an investigating officer anyone who "conducted a personal investigation of a general matter involving the particular offense." The judge advocate in that case extensively interviewed witnesses and prepared a comprehensive report that concluded there was probable cause to believe the accused committed offenses and he should be confined. However, the broad definition of an investigating officer contained in paragraph 64 that we relied upon in *Trakowski* was eliminated in the 1984 *Manual.* Moreover, we find the facts in *Trakowski* and the case *sub judice* are not closely related because the judge advocate in *Trakowski* was performing a quasi-judicial function in fulfilling his responsibility as a pretrial confinement hearing officer. *Courtney v. Williams,* 1 M.J. 267 (C.M.A.1976).

In *United States v. Plaut,* 39 C.M.R. 265, 1969 WL 5967 (C.M.A.1969), *overruled on other grounds, United States v. Payne,* 3 M.J. 354, 357 (C.M.A.1977), the court found the assistant trial counsel who had served as counsel to a three person board of investigation looking into the death of a marine was not disqualified under Article 27, UCMJ. This case was decided under the 1951 *Manual* that contained the same language in paragraph 64 as the 1969 *Manual.* As counsel for the board, assistant trial counsel inquired into the facts and circumstances surrounding the death, wrote to the coroner requesting clarification of certain matters following the autopsy, developed questions for witnesses, and submitted a memorandum to the commander outlining possible offenses committed by the accused and concluding that charges were appropriate on two offenses. The court relied on the fact that the judge advocate in the case was simply performing his duties as counsel for the board of investigation pursuant to an applicable Navy manual.

The involvement of Capt D in the commander-directed investigation prompted by SMSgt SRP's complaint to his commander pales in comparison to the judge advocate's involvement in *Plaut.* Furthermore, after the commander-directed investigation, an Article 32 investigation was conducted by another judge advocate. This investigation removes any appearance of undue advantage for the government.

We accept the essential findings of the military judge. The military judge did not abuse his discretion in ruling Capt D was not disqualified from serving as assistant trial counsel. Finally, the appellant suffered no prejudice as a result of Capt D's service as assistant trial counsel because there is no evidence that Capt D had access to witnesses or information not provided to the defense.

## V. Ineffective Assistance of Counsel

The appellant alleges ineffective assistance of counsel because a court member, Lt Col Hodges, was not adequately questioned about his relationship with a prosecution witness, Ms. Anderson, and the appellant's wife. The appellant requests we order a *DuBay* hearing or set aside the findings and sentence.

During *voir dire* conducted by the military judge, Lt Col Hodges said he had previously met the appellant and saw him occasionally at the gym and on the base. Lt Col Hodges also indicated he was introduced to MSgt SDP at 9th Air Force and would see her in the headquarters building. Finally, he told the military judge he had been introduced to Lt Col Ellis six years ago in Korea and saw her once at Shaw AFB. Lt Col Hodges believed that based on his contact with all these individuals, he could be fair and impartial. When trial counsel conducted his *voir dire,* Lt Col Hodges said Ms. Anderson had worked for him five years ago in Korea and that he got her a job at Shaw AFB in the

transportation squadron. He said his prior duty relationship with Ms. Anderson would not have a positive or negative effect on his evaluation of her testimony and that it would not affect his ability to be fair and impartial. Defense counsel did not question Lt Col Hodges individually. Prior to *voir dire*, the appellant's wife exercised her spousal privilege pursuant to Mil.R.Evid. 504 and refused to testify. Therefore, the court members were not questioned about their knowledge of her. At the conclusion of *voir dire*, neither side challenged any court member.

An appellant, in claiming ineffective representation, must establish serious deficiency in the counsel's performance and prejudice arising from that deficiency. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Scott,* 24 M.J. 186 (C.M.A.1987). To satisfy the first requirement, the allegation of ineffectiveness and the record of trial must contain evidence that, if unrebutted, would overcome the presumption of competence. *United States v. Lewis,* 42 M.J. 1 (1995). The second prong requires a showing that because of the deficient performance, the result of the proceeding was unreliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. We will not engage in "second-guessing tactical decisions" made by counsel if they appear reasonable. *United States v. Sanders,* 37 M.J. 116, 118 (C.M.A.1993).

The appellant, even with his affidavit, has not met his burden. First, Lt Col Hodges' knowledge about Ms. Anderson was sufficiently developed during *voir dire*. There was nothing more, unless Lt Col Hodges could be persuaded to admit he would find Ms. Anderson's testimony more credible than other witnesses based on that past relationship. However, we infer the appellant elected not to challenge Lt Col Hodges because his knowledge about Ms. Anderson was trumped by his statement that he occasionally saw the appellant at the gym but only saw MSgt SDP in the 9th Air Force headquarters building. The defense knew that two cornerstones of the prosecution's case involved the appellant and MSgt SDP exercising together at the gym and spending time with each other. Lt Col Hodges never

saw them together at the gym or in the headquarters building. Second, the appellant's argument as it relates to Lt Col Hodges' knowledge of Maj Vicki Mann is groundless. There was no need to ask any of the court members about Maj Vicki Mann because she was not going to be a witness during the trial.

For all these reasons, the appellant's claim of ineffective assistance fails summarily.

## VI. Officer Performance Reports

The appellant complains he was prejudiced by the failure to have all of his officer performance reports (OPRs) before the members during sentencing.

During an Article 39a, UCMJ, hearing, both the prosecution and the defense submitted sentencing evidence. Prior to trial, the prosecution obtained the appellant's OPRs maintained by the Air Force Personnel Center (AFPC). The OPRs received from AFPC covered the appellant's period of service from 28 September 1984 to 28 March 1995. When the prosecution offered these OPRs as a single exhibit, defense counsel objected that the exhibit was incomplete because the appellant's commissioned service began in July 1979. The military judge admitted the exhibit while leaving open the possibility that if the missing OPRs could be located they would also be admitted. The military judge, pursuant to defense counsel's request, informed the members the exhibit did not contain all of the appellant's OPRs. The record of trial contains no evidence the prosecution argued the missing OPRs were derogatory. In fact, the prosecution admitted his service was "glowing." By separate affidavit, the appellant says the OPRs covering the period from July 1979 to September 1984 were in his possession during the trial. The record provides no indication the appellant or his counsel informed the military judge of this fact or requested a delay to allow the appellant to retrieve these OPRs.

Decisions by a military judge on the admissibility of evidence are reviewed for a abuse of discretion. *United States v. Zakaria,* 38 M.J. 280, 283 (C.M.A.1993). An abuse of discretion is action that is arbitrary, clearly unreasonable or clearly erroneous.

*United States v. Travers,* 25 M.J. 61 (C.M.A. 1987). If error is found, this Court tests for prejudice. Article 59(a), 10 U.S.C. § 859; Mil.R.Evid. 103.

R.C.M. 1001(b)(2) directs the prosecution to present "personnel records of the accused" and includes records made or maintained in accordance with departmental regulations that reflect past military efficiency, conduct, performance, and history of the accused. In *United States v. Robbins,* 16 M.J. 736, 740 (A.F.C.M.R.1983), in response to concerns about "gamemanship" involving the introduction of an accused's personnel records, we encouraged The Judge Advocate General to initiate action to make trial counsel place the records into evidence. AFI 51–201, *Administration of Military Justice,* ¶ 8.5.4., directs trial counsel to offer all airman or officer performance reports maintained according to departmental directives, as evidence of the character of the accused's prior service.

█ The record of trial contains no evidence trial counsel was attempting to ignore the plain language of this instruction. We find no indication of any "gamemanship" or "tactical advantage" being practiced by the prosecution regarding these OPRs. Instead, it appears the appellant was in possession of the OPRs and failed to bring that fact to the attention of the military judge even while he was objecting to the completeness of the prosecution's exhibit. The appellant's actions indicate a belief on his part that these OPRs were not important for his sentencing case. Under those circumstances his argument now has no credibility.

A criminal trial is not a guessing game. An accused, alike with the Government, must deal fairly with the court. He cannot withhold information of matters affecting the trial on the chance that they may have a favorable effect, and then, when disappointed, complain. Even rights guaranteed by the Constitution are considered surrendered when the accused knowingly declines at the trial to avail himself of them.

█ *United States v. Wolfe,* 24 C.M.R. 57, 60, 1957 WL 4699 (C.M.A.1957) (citing *U.S. ex rel. Marino v. Holton,* 227 F.2d 886 (7th Cir.1955)). An appellant cannot withhold evidence at trial and later be allowed to assert he merits relief because the evidence was not considered. *Brandon v. United States,* 190 F.2d 175, 178 (9th Cir.1951).

## VII. Conclusion

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the accused occurred. Accordingly, the findings and sentence are

AFFIRMED.

Senior Judge YOUNG and Judge SPISAK concur.